UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CIVIL ACTION

VERSUS                                      NO. 23-191

DAVID SCOTT                                 SECTION M (1)


**ORDER & REASONS**

Before the Court is a motion to suppress filed by defendant David Scott seeking to exclude any evidence seized from his person and vehicle on August 3, 2023.[1]  The Government opposes the motion.[2]  On February 1, 2024, the Court held a suppression hearing.[3]  The Government presented the testimony of New Orleans Police Department ("NOPD") Detective Chad Cockerham, who was directly involved in the initial surveillance of Scott that led to his investigatory stop and arrest, as well as the testimony of three of the four responding NOPD officers – Officers Antravis Turner, Arden Taylor, and Douglas Boudreaux.  The Government also presented the footage captured by the Real-Time Crime Center ("RTCC") camera that Detective Cockerham was operating at the time of his surveillance of Scott,[4] and the body-worn camera footage of the four officers.[5]  Scott presented a still image taken from Officer Boudreaux's body-worn camera footage.[6]  The hearing continued on March 7, 2024, where Scott presented the testimony of Officer Kuykindall, Officer Kuykindall's body-worn camera footage,[7] and a

---

[1] R. Doc. 26.
[2] R. Doc. 34.
[3] R. Doc. 37.
[4] Government Exhibit 1.
[5] Government Exhibits 2; 3; 4; 5.
[6] Defense Exhibit A.
[7] Defense Exhibit B.

screenshot of the NOPD officers' group chat the day of the incident.[8]  After the hearing, the parties

submitted post-hearing briefs.[9]  Having considered the parties' memoranda, the testimony and

other evidence elicited at the hearing, the post-hearing briefs, and the applicable law, the Court

issues this Order & Reasons denying the motion to suppress.

## I.     BACKGROUND[10]

On August 3, 2023, at approximately 1:09 p.m., Detective Cockerham, a task force officer

with the NOPD and assigned to the Federal Bureau of Investigation, was in a remote location

conducting surveillance[11] of the Eastside Cash & Carry gas station located at the corner of Chef

Menteur Highway and Werner Drive in New Orleans when he observed an unknown person – later

identified as Scott – parked at one of the gas pumps.  Detective Cockerham testified that what

initially drew his attention to Scott was that he was driving a Kia, which was a commonly stolen

vehicle in 2022 and 2023, and the NOPD was "well aware that a lot of individuals that possessed

these stolen cars do come to the Eastside Cash & Carry, obviously to get gas, obviously to

patronize the business."[12]  Detective Cockerham could not see the full license plate, so he could

not confirm whether or not the car was stolen.  He then saw Scott, wearing blue jeans and a yellow

hoodie with the hood pulled up, exit his vehicle and walk into the store.  Detective Cockerham

testified that Scott's attire drew his attention because New Orleans was experiencing a heat wave

at the time, and hooded sweatshirts are frequently worn during armed robberies to conceal one's

identity.  Consequently, Detective Cockerham "keyed-in" or zoomed-in on Scott to observe him

---

[8] Defense Exhibit C.

[9] R. Docs. 48; 49; 50.

[10] Unless otherwise indicated, the facts provided are based on the testimony of Detective Cockerham and the four NOPD officers at the suppression hearing, the RTCC camera footage, and the officers' body-worn camera footage.

[11] Detective Cockerham performed this surveillance while stationed at the New Orleans Office of Homeland Security's RTCC, a centralized facility that receives live video feed from cameras positioned throughout the city.  *See* R. Doc. 40 at 6-7, 35-36.

[12] *Id.* at 11.

closer.  Detective Cockerham observed "a large bulge on [Scott's] right-hand side" as he was walking into the store.[13]  Then, approximately one minute later, Scott exited the store and returned to his vehicle to pump gas.  Detective Cockerham again observed a bulge on Scott's right-hand side and noticed that Scott "manipulated this object a couple of times while he was standing at the car."[14]  Believing the bulge to be a concealed firearm based on its size and placement, Detective Cockerham radioed into a secure communications channel to report his observations so that other officers could initiate a stop.  He informed the officers that Scott was "definitely bulging" but that he could not confirm that the bulge was a weapon.[15]  As he was relaying the information to the officers, the detective continued observing Scott and notified the officers that Scott, while still pumping gas, had returned to the driver's seat of his vehicle.

Approximately one minute later, four marked NOPD vehicles consisting of at least seven NOPD officers arrived at the scene and surrounded Scott's vehicle.  Officers Taylor and Turner made the initial contact with Scott and ordered him to show his hands and to exit his vehicle. Officers Taylor and Turner testified that Scott hesitated for a moment before complying with their orders – specifically, that Scott initially kept his right hand down by his side.[16]  Officer Taylor testified that when Scott exited the vehicle, he saw a firearm through the car's windshield and/or a crack in the door since the door was partially open.[17]  He observed the firearm laying "halfway on the seat and halfway in the crack between the driver's seat and the center console," such that he only saw the gun's handle and drum magazine.[18]  Thereafter, Officers Taylor and Turner frisked Scott and then Officer Taylor escorted Scott away from his vehicle and handcuffed him with the

---

[13] *Id.* at 13.
[14] *Id.*
[15] *See* Government Exhibit 1; R. Doc. 40 at 16.
[16] R. Doc. 40 at 50-51, 52, 70.
[17] *Id.* at 69-70.
[18] *Id.* at 80.

assistance of Officer Kuykindall, who had just arrived at the scene.  Officer Taylor conducted a search of Scott's person, finding "around $1,300 in cash" and marijuana in Scott's right pocket, and "several tapentadol pills" in his left pocket.[19]  He did not locate a firearm on Scott's person.

While Officer Taylor was conducting the search, Officer Kuykindall opened the passenger side door of the Kia to "look into the vehicle to make sure there's no one else."[20]  Upon doing so, he observed a firearm between the driver seat and center console, but he did not remove it.  Instead, he called in the Kia's license plate number to determine if the car was stolen.  Thereafter, Officer Boudreaux peeked into the vehicle through the front driver's side window, again to "make sure there was nobody else in the vehicle," and observed a firearm "stuffed between the seat and the center console," such that he could see the back of it, the handle, and the drum magazine.[21]  He then opened the door and secured the weapon.  Sometime later, Officer Boudreaux entered the store to review the store's camera footage.

Scott was indicted on August 24, 2023, for possession with the intent to distribute Tapentadol and possession of a firearm in furtherance of a drug trafficking crime.

## II.   PENDING MOTION

Scott argues that the officers violated his Fourth Amendment rights because they lacked reasonable suspicion to stop him, arrested and searched him without probable cause, and "searched his car without justification."[22]  First, Scott contends that Detective Cockerham's observations of a bulge in Scott's waistband, and that Scott clutched it, are insufficient to provide the officers with reasonable suspicion that Scott was illegally carrying a concealed firearm, given that Detective

---

[19] *Id.* at 73.
[20] R. Doc. 45 at 17.
[21] R. Doc. 40 at 105.
[22] R. Docs. 48 at 1; 26-1 at 7-8.

4

Cockerham did not testify to the shape of the bulge or that he ever saw any part of a firearm.[23]  In addition, says Scott, Detective Cockerham's testimony regarding his experience with firearms in waistbands is irrelevant because the RTCC footage shows that the bulging was from an object in Scott's hooded sweatshirt and not his waistband.[24]  Second, Scott argues that the officers lacked probable cause to arrest him and search his pockets because Officer Turner testified that he did not see the gun prior to Scott's arrest and, although Officer Taylor testified to seeing the gun before the arrest, his testimony was inconsistent.[25]  In particular, Scott points to the fact that Officer Taylor first testified that he saw the gun through the opening in the car door but later testified that he saw the gun through the car windshield.[26]  He also argues that Officer Taylor's testimony regarding the gun's position was inconsistent with Officer Boudreaux's testimony that the gun was "stuffed between the seat and the center console" and internally inconsistent, as Officer Taylor testified that the gun was "slanted to the right next to that driver's seat," that it was "on the seat," and then that it was "halfway on the seat and halfway in the crack," and later asked Officer Boudreaux how the gun was positioned.[27]  Scott then contends that even if Officer Taylor did see the firearm prior to arresting Scott, it was not reasonable for the officers to conclude that Scott had been concealing the firearm prior to the stop, given that Detective Cockerham only relayed his observations of a bulge and not a "large bulge," meaning that he observed only a gun and not a gun with a drum magazine.[28]  Scott also insists that the officers lacked both reasonable suspicion

---

[23] R. Doc. 48 at 1-4.
[24] *Id.* at 4-5.
[25] *Id.* at 7-18.
[26] *Id.* at 7-9.
[27] *Id.* at 9-11 (citing R. Doc. 40 at 70, 74, 80).
[28] *Id.* at 12-13.

and probable cause because they did not ask him whether he had a concealed carry permit.[29] Lastly, Scott argues that the officers lacked probable cause to search his vehicle.[30]

In opposition, the Government argues that the totality of the circumstances – Detective Cockerham's knowledge of crimes occurring at the East Side Cash & Carry in the past, Scott's attire during a heat advisory, the bulge, and his repeated manipulation of the bulge – provided reasonable suspicion that Scott was illegally concealing a firearm.[31]  It then argues that the officers had probable cause to arrest and search Scott, citing his hesitation to show his hands, Officer Taylor's observation of the firearm, and the lack of any bulge on Scott's person after exiting his vehicle.[32]  Next, the Government argues that the carrying of a concealed firearm is "presumptively unlawful," and that the officers' belief that Scott was doing so is sufficient to constitute probable cause for his arrest.[33]  In other words, it argues that the officers did not have to inquire into whether Scott had a concealed carry permit before arresting him.[34]  Lastly, the Government argues that the recovery of the firearm from the vehicle was lawful, as the firearm was in plain view of Officer Kuykindall when he opened the car door to see if there were any additional passengers, and when Officer Boudreaux entered the vehicle to render the firearm safe.[35]

In reply, Scott argues that the Government has failed to meet its "burden of proving its version of the facts," contending that the Government failed to respond to the alleged inconsistencies raised in his brief.[36]  He also insists that the Government failed to prove that the

---

[29] *Id.* at 15-18; *see also* R. Doc. 26 at 10-11.
[30] R. Doc. 48 at 18-20.
[31] R. Docs. 34 at 6-8; 49 at 2-4.
[32] R. Docs. 34 at 8; 49 at 4-5.
[33] R. Docs. 34 at 8-10; 49 at 5.
[34] *See* R. Docs. 34 at 8-10; 49 at 5.
[35] R. Doc. 49 at 6.
[36] R. Doc. 50 at 1-8.

officers had reasonable suspicion to stop Scott or that the warrantless search and seizure of Scott and his vehicle were justified.[37]

### III.   LAW & ANALYSIS

#### A. Investigatory Stop

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV. "The exclusionary rule, a judicially created deterrence measure, provides that evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022).  "Warrantless searches and seizures," such as the one here, "are *per se* unreasonable subject to certain narrow exceptions." *Id.*  When a warrantless search or seizure is at issue, "[t]he government bears the burden of showing an exception applies." *Id.*

Officers are permitted to make warrantless investigatory stops "based on reasonable suspicion that the person is engaged in criminal activity or wanted in connection with a completed felony." *Id.* (citing, *inter alia*, *Terry v. Ohio*, 392 U.S. 1, 27-31 (1968)).  "In an analytical framework inspired by principles discussed in *Terry v. Ohio*, [courts] review the legality of police investigatory stops in a two-part test." *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (footnote omitted).  That test requires courts to "first examine whether the officer's action was justified at its inception and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* (footnote omitted).  In conducting a reasonable suspicion analysis, courts "'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting

---

[37] *Id.* at 2-5, 7-8.

legal wrongdoing.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.*

When weighing the totality of the circumstances, "a court may not consider the relevant factors in isolation from each other." *Id.* (citing *Arvizu*, 534 U.S. at 274); *see also United States v. Jacquinot*, 258 F.3d 423, 427-28 (5th Cir. 2001) ("The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total." (citing *United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000))). "Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *Alvarez*, 40 F.4th at 346. Thus, "[f]actors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *Jacquinot*, 258 F.3d at 427-28 (citing *Zapata-Ibarra*, 212 F.3d at 881).

"The facts leading to a finding of reasonable suspicion do not have to be based on a law enforcement officer's personal observation, but can also arise from the 'collective knowledge' of law enforcement entities, so long as that knowledge gives rise to reasonable suspicion and was communicated between those entities at the time of the stop." *United States v. Massi*, 761 F.3d 512, 521 (5th Cir. 2014). As the Fifth Circuit has explained, "[t]he collective knowledge theory for reasonable suspicion applies so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *United States v. Powell*,

732 F.3d 361, 369 (5th Cir. 2013) (quoting *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007)).

### 1.   The Officers Had Reasonable Suspicion to Stop Scott.

Scott argues that the observation of a bulge on his person was not enough to provide Detective Cockerham with reasonable suspicion that he was possessing a concealed firearm. However, the bulge was not the only reason Detective Cockerham was suspicious of Scott.

According to Detective Cockerham, he focused on the 7th Police District (New Orleans East) on the day in question because the NOPD was "seeing an uptick in violent crime" in that district and "getting information from the leadership in the 7th District that they were having certain problems with different locations with the drug activity and the individuals possessing firearms."[38]  With regard to the specific store, Detective Cockerham stated that "the Eastside Cash & Carry has been a problem spot for the 7th Police District as it relates to narcotics activity and individuals possessing firearms," as well as reported robberies and carjackings.[39]  Indeed, he and other officers have made roughly 20 to 25 arrests for illegally possessing firearms there in the last year.[40]  "An individual's presence in a ['high crime area,'] standing alone, is not enough to support a reasonable, particularized suspicion [of criminal activity, but a location's characteristics are relevant] in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (quoting *Adams v. Williams*, 407 U.S. 143, 144, 147-48 (1972)); *see also United States v. Hill*, 752 F.3d 1029, 1035 (5th Cir. 2014) ("The fact that law enforcement officers know a particular area to be high in crime is indeed a 'relevant contextual consideration.'" (quoting *Wardlow*, 528 U.S. at 124)).  As Scott did not rebut

---

[38] R. Doc. 40 at 7-8.
[39] *Id.* at 8-9.
[40] *Id.* at 9.

Detective Cockerham's testimony describing the store as a high-crime area, the Court finds Scott's presence there to be a relevant factor in the reasonable suspicion analysis.

The RTCC footage also shows Scott wearing jeans and a hooded sweatshirt, with the hood pulled up. Detective Cockerham testified that this drew his attention because New Orleans was experiencing a heat advisory at the time and, in his experience, hooded sweatshirts are often worn to conceal one's identity during armed robberies. A defendant's clothing may be considered in determining whether an officer had reasonable suspicion to stop him. *See United States v. Jackson*, 2020 WL 2496028, at *8 (M.D. La. May 14, 2020) (citing the defendant's wearing "odd clothing that could easily conceal a weapon," specifically, "a heavy coat on an extremely hot summer day," as a factor in determining that the stop was reasonable); *cf. United States v. Drayton*, 536 U.S. 194, 207 (2002) (citing the defendants' baggy clothing despite warm temperatures as a relevant factor that can be used in determining whether an officer had grounds for a *Terry* stop, but ultimately not deciding that issue); *United States v. Cervantes*, 797 F.3d 326, 341 n.70 (5th Cir. 2015) (stating that "there is no reason to believe that wearing jackets on an October morning near Odessa, Texas is suspicious," since "the low temperature that day was 57 degrees"). Thus, the Court will also consider this fact in determining whether reasonable suspicion existed.[41]

Keying in on Scott, Detective Cockerham then observed the bulge and Scott's manipulation of the bulge twice while pumping gas. Based on his training and experience, particularly regarding

---

[41] In his reply brief, Scott apparently argues that his attire is irrelevant since Detective Cockerham testified that Scott's attire drew his attention because he suspected that Scott may commit an armed robbery, not that Scott was carrying a concealed firearm. *See* R. Doc. 50 at 7. Scott's argument in effect seeks to limit the facts relevant to the Court's reasonable suspicion analysis to Detective Cockerham's observations after he noticed the bulge. But such a limitation prevents an analysis of the totality of the circumstances leading to Scott's seizure. It also isolates from a "'necessarily fact-specific'" inquiry those "'factors which by themselves may appear innocent, [but which] may in the aggregate rise to the level of reasonable suspicion.'" *United States v. Reyes*, 963 F.3d 482, 488 (5th Cir. 2020) (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)). Accordingly, the Court will weigh all of the pertinent factors in determining whether the officers had reasonable suspicion at the time they conducted the investigatory stop of the defendant.

the bulge and its location on Scott's person,[42] the detective believed at that point that Scott was concealing a firearm and called for an investigatory stop.[43]  Although Detective Cockerham could not definitively say whether Scott was concealing a weapon, "[i]n determining reasonable suspicion, courts must consider the facts in light of the officer's experience."  *United States v. Flowers*, 6 F.4th 651, 656 (5th Cir. 2021).

A similar stop was addressed in *United States v. Conner*, 2024 WL 343143 (E.D. La. Jan. 30, 2024).  In that case, Detective Cockerham was surveilling a high-crime area of New Orleans when he observed three individuals possibly possessing concealed firearms.  He communicated his observations to other officers, stating that he knew two of the individuals had concealed firearms and that the third (later identified as Conner) "possibly could be" carrying a firearm as well because his "joggers [were] sagging in the pocket area real, real low on the right-hand side."  *Id.* at *2.  At the suppression hearing, Detective Cockerham testified that he used the word "possibly" to indicate that, while his training and experience led him to believe the object was a firearm, he "had not laid eyes on the actual firearm."  *Id.* at *3.  When the officers stopped Conner, they found a concealed firearm on his person.  Conner sought to suppress the evidence of the firearm, arguing that the officers lacked reasonable suspicion because a pocket is not an unusual

---

[42] Scott argues that Detective Cockerham's testimony regarding waistbands is irrelevant because the footage "clearly shows that the 'bulging' was from an object in the pocket of Mr. Scott's hooded sweatshirt (which spans the front of the sweatshirt), *not* an object in his waistband on his right-hand side."  R. Doc. 48 at 4 (emphasis in original). However, Detective Cockerham's radio communication to the officers – which was picked up on their body-worn camera footage – did not include a description of where the bulge was located on Scott's person other than that the bulge was on his "right side."  In other words, Detective Cockerham did not indicate in real time whether the object was in Scott's waistband or his hooded sweatshirt.  And, even though he did testify to waistbands being a common place to conceal firearms, he also testified that the right-hand side is a common place to hold them, based on his training and experience.  R. Doc. 40 at 28-29.

[43] *Id.* ("The Kia was the initial focus for me to send a team in to get the last few letters of the license plate. However, when I saw Mr. Scott obviously had a bulge on his right-hand side, based on my training and experience that is the location where individuals conceal firearms.  I elected to continue to watch Mr. Scott.  And once Mr. Scott came back to the vehicle and began to pump the gas, I see the large – still see the bulge and then he manipulates the bulge twice.  In my training and experience, I believed that he was possessing a firearm at that point based on his actions.").

place for a heavy object. *Id.* at *7. But the court recognized that the stop was not based solely on Conner having an object in his pocket; instead, Detective Cockerham testified that the object had an "L shape," which was consistent with a firearm, that he received training in identifying firearms, including situations where firearms are placed in pockets, and that he used the word "possibly" because, although he had not seen the firearm, he believed the object was a firearm based on his training. *Id.*

Here, as in *Conner*, Detective Cockerham testified that his training led him to believe that Scott was possessing a concealed firearm. He explained that "when [he] saw Mr. Scott obviously had a bulge on his right-hand side, based on [his] training and experience that is the location where individuals conceal firearms."[44] While Detective Cockerham did not testify to seeing an "L shape," like he did in *Conner*, such a showing is not necessarily required. Rather, all of the relevant facts must be weighed to determine whether reasonable suspicion existed. Weighing the totality of the circumstances in this case – Scott's presence in a high-crime area, his attire during a heat wave, the bulge, the fact that he was clutching the bulge, and Detective Cockerham's experience and training in identifying concealed weapons – the Court finds that the officers had reasonable suspicion to stop Scott.

Scott also argues that the officers lacked reasonable suspicion to stop him because Detective Cockerham merely assumed that Scott did not have a concealed carry permit. In other words, Scott argues that the officers had no basis to believe he was *illegally* carrying a concealed weapon since they did not know whether he had a permit. A similar issue was addressed by Judge Africk in *United States v. Wilson*, 2023 WL 3601590 (E.D. La. May 23, 2023), and in *Conner*, 2024 WL 343143. In *Wilson*, he analyzed Louisiana's concealed carry law and determined that

---

[44] R. Doc. 40 at 28-29.

"Louisiana law makes the carrying of a concealed firearm 'presumptively unlawful' and therefore likely justifies a *Terry* stop." *Wilson*, 2023 WL 3601590, at *5. This conclusion was based on the fact that "Louisiana law prohibits 'the intentional concealment of any firearm, or other instrumentality customarily used or intended for probable use as a dangerous weapon, on one's person' and provides that this prohibition 'shall not apply to a person with a valid concealed handgun permit.'" *Id.* at *5 (alteration omitted) (quoting La. R.S. 14:95(A)(1)(a), (b)). He then relied on this analysis in *Conner*, holding that the "possession of a valid permit is an affirmative defense in Louisiana." 2024 WL 343143, at *8 (recognizing that the *Wilson* analysis "is consistent with the analysis adopted by the Eighth Circuit, Eleventh Circuit, Sixth Circuit, and Third Circuit") (citing *United States v. Pope*, 910 F.3d 413, 415-16 (8th Cir. 2018); *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012); *United States v. Galaviz*, 645 F.3d 347, 356 (6th Cir. 2011); and *United States v. Gatlin*, 613 F.3d 374 (3d Cir. 2010)).

The Court agrees that the possession of a valid concealed carry permit is an affirmative defense in Louisiana. When approached by the officers, Scott did not state that he had a permit, so the officers reasonably assumed he did not have one.[45]

## 2. The Officers Had Reasonable Suspicion to Frisk Scott.

Scott also argues that the officers lacked reasonable suspicion to frisk him. "Assuming the initial stop was lawful, 'in order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry.'" *United States v. Thomas*, 997 F.3d 603, 614 (5th Cir. 2021) (alteration omitted) (quoting *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010)); *see also Terry*, 392 U.S. at 24 ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently

---

[45] Moreover, a subsequent inquiry proved that he did not have a permit.

dangerous to the officer or to others," the officer may "take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."). "An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." *United States v. Tuggle*, 284 F. App'x 218, 223 (5th Cir. 2008) (quoting *United States v. Michelletti*, 13 F.3d 838, 840-41 (5th Cir. 1994)). "'In assessing the reasonableness of an officer's actions, it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?'" *Id.* (quoting *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir.1992) (en banc)). "This inquiry does not depend on the 'officer's state of mind, or his stated justification for his actions.'" *Id.* (quoting *Rideau*, 969 F.2d at 1574). "Instead, the Fourth Amendment is satisfied 'as long as all the facts and circumstances, viewed objectively, support the officer's decisions.'" *Id.* (alteration omitted) (quoting *Rideau*, 969 F.2d at 1574). "In short, '[courts] must attempt to put [them]selves in the shoes of a reasonable police officer as he or she approaches a given situation and assesses the likelihood of danger in a particular context.'" *Id.* (quoting *Rideau*, 969 F.2d at 1574).

Here, the officers reported to the location (the Eastside Cash & Carry gas pumps) because Detective Cockerham relayed to them his belief that Scott possessed a concealed firearm. After the officers stopped Scott, they ordered him out of his vehicle and to show his hands. Officers Taylor and Turner testified that Scott hesitated when they gave this instruction, and Officer Taylor further testified that he saw Scott "kind of reach to his right, right before he stepped out of the car towards" Officer Turner.[46] Officer Taylor also observed the firearm in the vehicle. The officers

---

[46] R. Doc. 40 at 69.

then frisked Scott by patting him down and lifting his sweatshirt. Since the stop was initiated based on the officers' suspicion that Scott possessed a concealed weapon, the frisk was necessary to determine whether Scott was in fact carrying a weapon, and to ensure the officers' safety. Although Officer Taylor saw a firearm in the vehicle before frisking Scott, he could not have definitively known whether that was indeed the firearm Detective Cockerham believed he saw on Scott's person or whether that was the only firearm available to Scott. Accordingly, the Court finds that the officers had reasonable suspicion to frisk him.

### B. Arrest and Search Incident to Arrest

#### 1. The Officers Had Probable Cause to Arrest Scott.

"To remain within the bounds of the Fourth Amendment, a warrantless arrest must be supported by probable cause." *Sam v. Richard*, 887 F.3d 710, 715 (5th Cir. 2018). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc). "The police officer's knowledge must establish that there was a 'fair probability that a crime occurred.'" *United States v. Nunez-Sanchez*, 478 F.3d 663, 666-67 (5th Cir. 2007) (quoting *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir.1999)). "'The requisite "fair probability" is something more than a bare suspicion, but need not reach the fifty percent mark.'" *Id.* at 667 (alteration omitted) (quoting *Garcia*, 179 F.3d at 269). "'When considering what a "reasonable person" would have concluded, [courts] take into account the expertise and experience of the law enforcement officials." *Id.* (quoting *Garcia*, 179 F.3d at 268).

Officer Taylor testified that, based on Detective Cockerham's observations and description of a bulge on Scott's right side, and he himself "seeing the firearm on [Scott's] right side [in the

car] where [Scott] was reaching with the large drum magazine," he concluded that Scott "was most likely discarding that firearm off his person before he was making contact with police."[47]  This testimony, along with the rest of the evidence presented, establishes a fair probability that a crime had occurred – that is, that Scott was concealing a firearm prior to the stop. Thus, the officers had probable cause to arrest him.

In doing so, the Court finds unavailing Scott's argument that the officers lacked probable cause to arrest him because Detective Cockerham only relayed his observations of a "bulge" and not a "large bulge," which Scott contends means that the officers were looking for a firearm in Scott's waistband and not a firearm with a drum magazine in his sweatshirt pocket.  Although Officer Taylor did testify that Detective Cockerham's report of a bulge led him to believe that Scott had a firearm in his waistband,[48] no evidence was presented showing that Detective Cockerham told the officers the size of the bulge – whether small or large – or even that he told the officers that the bulge was in Scott's waistband.  While it appears from the video that the bulge *could* have been in Scott's sweatshirt pocket and not his waistband, no angle conclusively shows that was the case, and, regardless, it does not negate the above finding of probable cause to arrest for a concealed firearm.  And, in any event, the firearm was no longer on Scott's person by the time of the arrest.

Scott again argues that, because the officers did not inquire into whether he had a concealed carry permit until after he was arrested, the officers lacked probable cause to arrest him.  For the same reasons set out above, the Court finds that the possession of a valid concealed carry permit

---

[47] R. Doc. 40 at 75.  Officer Taylor had previously responded to the question, "And where was the gun located?," by saying: "The gun was to [Scott's] right on that seat."  *Id.* at 74.  The Court specifically finds Officer Taylor's testimony concerning the firearm to be credible, notwithstanding Scott's argument that it was inconsistent. Given the split-second observations he was called upon to make in a tense encounter involving an automobile with tinted windows, Officer Taylor may have been less certain of the exact position of the firearm inside the car than he was that what he saw was indeed a firearm.

[48] *Id.* at 79.

is but an affirmative defense in Louisiana, and Scott did not raise the defense when he was arrested – that is to say, he did not tell the officers he had a permit. Nor could he since he had no such permit.

### 2. The Officers Had Probable Cause to Search Scott's Person.

Next, Scott argues that the officers lacked probable cause to search his person. "[A] search incident to arrest may only include 'the arrestee's person and the area "within his immediate control" – construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.'" *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). "That limitation … ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Id.* (citing *Chimel*, 395 U.S. at 763). The Fifth Circuit has held that "[o]nce police make a lawful arrest, a full search of a person incident to the arrest 'requires no additional justification' and constitutes a reasonable search under the Fourth Amendment." *United States v. Clark*, 647 F. App'x 419, 423 (5th Cir. 2016) (first quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973), and then citing *United States v. Johnson*, 445 F.3d 793, 795-96 (5th Cir. 2006)).

Here, the officers arrested Scott and then searched his pockets, where they found Tapentadol pills and a large amount of cash. Because the Court finds that Scott's arrest was lawful, the search of his person was reasonable.

### C. Search of Scott's Vehicle

Lastly, Scott argues that the officers illegally searched his vehicle. In response, the Government contends that the search was lawful pursuant to the automobile exception.[49]

---

[49] *See* R. Docs. 26-1 at 16-17; 49 at 6. The Government also cites the plain-view exception. "[T]he plain-view exception permits police to seize items without a warrant where: '(1) the police lawfully entered the area where

The automobile exception permits officers to search a vehicle "if they have probable cause to believe that the vehicle contains contraband or evidence of a crime." *United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011) (citing *United States v. Buchner*, 7 F.3d 1149, 1154 (5th Cir. 1993)). Again, "[a] probable cause determination should be based on the totality of the circumstances," and "[t]he evidence in support of probable cause 'must be viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search.'" *Buchner*, 7 F.3d at 1154 (first citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983), and then quoting *United States v. Muniz-Melchor*, 894 F.2d 1430, 1438 (5th Cir. 1990)).

Here, Detective Cockerham informed the officers that Scott was "bulging," meaning he believed Scott possessed a concealed firearm. The officers testified that when they stopped Scott, he hesitated and reached to his right side, and Officer Taylor stated that he saw the firearm in the vehicle during the stop. Then, when the officers frisked Scott, they found no "bulge" or firearm

---

the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was "immediately apparent;" and (4) the police had a lawful right of access to the item.'" *United States v. Miller*, 839 F. App'x 875, 878 (5th Cir. 2021) (quoting *United States v. Rodriguez*, 601 F.3d 402, 407 (5th Cir. 2010)). The second, third, and fourth elements are easily met here. Regarding the second element, the officers testified that the firearm was partially on the seat and partially wedged between the seat and the center console. Given the location and the size of the firearm, the firearm was in plain view. As to the third element, the incriminating nature of the firearm was apparent. "The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband." *United States v. Buchanan*, 70 F.3d 818, 826 (5th Cir. 1996) (citing *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987)). The officers stopped Scott because they believed he possessed a concealed firearm, but no firearm was found on him, and Officer Taylor testified that he saw Scott reach to his right side in the car. Then, seeing where the firearm was located in the vehicle, Officer Taylor believed that it must have been the "bulge" Detective Cockerham observed earlier. As to the fourth element, the officers had a lawful right to access the firearm. The officers believed that the firearm was evidence of the crime for which Scott was arrested, and it could potentially pose a safety concern to the officers or others in the area if someone gained access to it. However, "[t]he first element in this analysis requires the officers to have lawfully been in the position from which they viewed the contraband." *United States v. Perry*, 95 F. App'x 598, 601 (5th Cir. 2004). Officer Taylor testified that he saw the firearm inside the car when he stopped Scott and escorted him away from the vehicle. Having found that the investigatory stop was lawful, Officer Taylor was lawfully positioned when he viewed the firearm. Officers Boudreaux and Kuykindall testified that the firearm was in their plain view when they peered into the vehicle to see if there were other passengers. *See* R. Docs. 40 at 105, 110; 45 at 17. While Officer Boudreaux merely peered into the vehicle through the driver's side window, which may not have constituted a search at all, *see Carr v. Hoover*, 837 F. App'x 279, 283 (5th Cir. 2020) (cursory look inside a vehicle is not a search under the Fourth Amendment), Officer Kuykindall opened the passenger's side door to look into the vehicle. On the whole, then, it appears that all four elements of the plain-view exception are satisfied. Nonetheless, because the Court finds that the automobile exception applies, the search of Scott's car was lawful on that basis alone.

on his person.  Accordingly, the officers had probable cause to believe that Scott had discarded the firearm before exiting his vehicle.  In other words, they had probable cause, based on the totality of the circumstances, to believe that his vehicle contained evidence of the crime.

The search of Scott's vehicle was also a permissible search incident to arrest.  A search pursuant to this exception is "broad enough to include the interior of a vehicle if the arrestee was a recent occupant of the vehicle and it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'"  *United States v. Bass*, 996 F.3d 729, 739 n.2  (5th Cir. 2021) (quoting *Gant*, 556 U.S. at 343).  Again, the officers stopped Scott because they believed he was in possession of a concealed firearm, but no "bulge" fitting Detective Cockerham's description was found on him.  Officer Taylor testified that he believed Scott discarded the firearm off his person based on his seeing the firearm in Scott's car.  The Court finds that it was reasonable to believe that evidence relevant to the crime underlying Scott's arrest – a firearm – might be found in the vehicle.  Thus, for all of these reasons, the officers lawfully searched Scott's vehicle.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that defendant's motion to suppress (R. Doc. 26) is DENIED.

New Orleans, Louisiana, this 7th day of May, 2024.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE